JS 44 (Rev. 06/17) GEKP 18CV3695

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

Securities and Exchange Commission

GEKP

**(b)** County of Residence of First Listed Plaintiff ______

*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Jennifer Chun Barry, Securities and Exchange Commission
1617 JFK Blvd, Ste 520, Philadelphia, PA 19103 (215) 597-3100

**DEFENDANTS** 18 3695

Marvin Mychal-Christopher Kendricks, a/k/a Mychal Kendricks and Damilare Sonoiki

County of Residence of First Listed Defendant Philadelphia

*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

Michael A. Schwartz, Pepper Hamilton LLC, 3000 Two Logan Square
Eighteenth and Arch Streets, Philadelphia, PA 19103 (215) 981-4000

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☒ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☒ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

**V. ORIGIN** *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. §§ 78j(b), 78n(e) and 17 C.F.R. §§ 240.10b-5, 240.14e-3

Brief description of cause:
Insider trading

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P. **DEMAND $**

CHECK YES only if demanded in complaint: **JURY DEMAND:** ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** *(See instructions):* JUDGE ______ DOCKET NUMBER ______

DATE AUG 29 2018 SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

18 3695

GEKP

**DESIGNATION FORM**

*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: Securities and Exchange Commission

Address of Defendant: ______

Place of Accident, Incident or Transaction: Eastern District of Pennsylvania

***RELATED CASE, IF ANY:***

Case Number: ______ Judge: ______ Date Terminated: ______

Civil cases are deemed related when ***Yes*** is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court? Yes ☐ No ☑
2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court? Yes ☑ No ☐
3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court? Yes ☐ No ☑
4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual? Yes ☐ No ☑

I certify that, to my knowledge, the within case ☒ **is** / ☐ **is not** related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 8/29/2018 [signature] *Attorney-at-Law / Pro Se Plaintiff* Bar ID: 72961 *Attorney I.D. # (if applicable)*

**CIVIL: (Place a √ in one category only)**

***A. Federal Question Cases:***

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Patent
- ☐ 6. Labor-Management Relations
- ☐ 7. Civil Rights
- ☐ 8. Habeas Corpus
- ☑ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☐ 11. All other Federal Question Cases *(Please specify):* ______

***B. Diversity Jurisdiction Cases:***

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify):* ______
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☐ 9. All other Diversity Cases *(Please specify):* ______

**ARBITRATION CERTIFICATION**

*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, Jennifer Chun Barry, counsel of record *or* pro se plaintiff, do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☑ Relief other than monetary damages is sought.

AUG 29 2018

DATE: 08/29/2018 [signature] *Attorney-at-Law / Pro Se Plaintiff* Bar ID: 72961 *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

GEKP

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| Securities and Exchange Commission | : | CIVIL ACTION |
| v. | : | |
| Marvin Mychal-Christopher Kendricks, a/k/a "Mychal Kendricks," and Damilare Sonoiki | : | NO. 18 3695 |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255. ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits. ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2. ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos. ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.) ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks. (X)

| 8/29/2018 | [signature] | Plaintiff |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| (215) 597-3100 | (215) 597-2140 | BarryJ@sec.gov |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

AUG 29 2018

GEKP

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

1

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**MARVIN MYCHAL-CHRISTOPHER KENDRICKS, a/k/a "Mychal Kendricks," and DAMILARE SONOIKI,**<br><br>**Defendants.** | Civil No : 18 3695<br><br>Jury Trial Demanded |

FILED
AUG 29 2018
KATE BARKMAN, Clerk
By ______ Dep. Clerk

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") files this Complaint against defendants Marvin Mychal-Christopher Kendricks ("Kendricks") and Damilare Sonoiki ("Sonoiki") (collectively, "Defendants") and alleges as follows:

## SUMMARY OF THE ACTION

1. This matter involves multiple instances of insider trading by Kendricks, a former linebacker for the Philadelphia Eagles of the National Football League, and Sonoiki, a former investment banking analyst at a large investment bank (the "Investment Bank"). From July 2014 through November 2014, Sonoiki tipped Kendricks about at least four corporate acquisitions that the Investment Bank was advising in advance of those deals being announced to the public. Based on these tips, Kendricks purchased the securities of the companies that were about to be acquired and made approximately $1.2 million in illegal profits.

2. Defendants used a variety of methods to conceal their communications. Kendricks and Sonoiki attempted to minimize telephone calls, employed coded language in text messages, and used other methods of communication that they apparently believed would not be uncovered, such as FaceTime. Kendricks gave cash kickbacks to Sonoiki for providing the illegal tips. Kendricks also compensated Sonoiki by providing him with free tickets to

Eagles games, by paying for a luxury car service to drive Sonoiki approximately 180 miles to attend a nightclub event in York, Pennsylvania, and by inviting Sonoiki to the set of pop star Teyana Taylor's music video, in which Kendricks made a cameo appearance.

3. As a result of the conduct described in this complaint, Defendants violated Sections 10(b) and 14(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78n(e)] and Rules 10b-5 and 14e-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.14e-3].

## NATURE OF THE PROCEEDINGS AND REQUESTED RELIEF

4. The Commission brings this action pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

5. The Commission seeks permanent injunctions against Defendants enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, disgorgement of all ill-gotten gains together with prejudgment interest, and civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]. The Commission further seeks any other relief as the Court may deem just and appropriate. [15 U.S.C. § 78u(d)(5)]

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to Sections 21(d) and (e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and (e), 78u-1, and 78aa].

7. Venue in this District is proper pursuant to Section 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u-1, and 78aa]. Among other things, certain of the acts, practices, and courses of business constituting the violations of the federal securities laws alleged herein occurred within the Eastern District of Pennsylvania, including the opening of a trading account for Kendricks, illegal trading in that account, and kickback payments to Sonoiki. In addition, Kendricks resides in this District.

## THE DEFENDANTS

8. **Kendricks**, age 27, currently resides in Philadelphia, Pennsylvania and Cleveland, Ohio. From 2012 to 2018, Kendricks was a linebacker for the Philadelphia Eagles of the National Football League.

9. **Sonoiki**, age 27, lives in California. From approximately June 2013 through June 2015, Sonoiki lived in New York City and worked as an analyst in the Technology, Media, and Telecommunications ("TMT") group of the Investment Bank's investment banking division. While at the Investment Bank, Sonoiki held a Series 79 license as a registered investment banking representative.

## RELEVANT ENTITIES

10. **Investment Bank,** a large investment banking, securities, and investment management firm, is headquartered in New York, New York.

11. Sonoiki tipped Kendricks material nonpublic information about transactions advised by the Investment Bank, including transactions involving the four publicly-traded companies identified below whose common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act.

12. **Compuware Corporation ("Compuware")** was, at all relevant times, a Michigan corporation headquartered in Detroit that manufactured computer software. Compuware's common stock was traded on NASDAQ under the ticker symbol "CPWR." On September 2, 2014, Compuware announced that it was being acquired by the private-equity firm Thoma Bravo LLC ("Thoma Bravo") in a going-private transaction. The Investment Bank advised Compuware in connection with the transaction.

13. **Move, Inc. ("Move")** was, at all relevant times, a Delaware corporation headquartered in Westlake Village, California that operated realtor.com and other real estate-related websites. Move's common stock was traded on NASDAQ under the ticker symbol "MOVE." On September 30, 2014, Move announced that it was being acquired by News

Corporation ("News Corp") in a cash tender offer. The Investment Bank advised News Corp in connection with the transaction.

14. **Sapient Corporation ("Sapient")** was, at all relevant times, a digital advertising firm incorporated in Delaware and headquartered in Boston, Massachusetts. Sapient's common stock was traded on NASDAQ under the ticker symbol "SAPE." On November 3, 2014, Sapient announced that it was being acquired by the French advertising firm Publicis Groupe PLC ("Publicis") in a cash tender offer. The Investment Bank advised Sapient in connection with the transaction.

15. **Oplink Communications, Inc. ("Oplink")** was, at all relevant times, a manufacturer of optical communications equipment incorporated in Delaware and headquartered in Fremont, California. Oplink was traded on NASDAQ under the ticker symbol "OPLK." On November 19, 2014, Oplink announced that it was being acquired by a subsidiary of Koch Industries, Inc. ("Koch") in a cash tender offer. The Investment Bank advised Koch in connection with the transaction.

## FACTS

### A. Sonoiki's Access to Material Nonpublic Information and the Investment Bank's Policies

16. In July 2013, Sonoiki joined the Investment Bank as an analyst in the investment banking division's TMT group. As an analyst, Sonoiki had access to material nonpublic information about pending business transactions being advised by the TMT group.

17. All personnel of the Investment Bank were subject to an internal compliance policy entitled, "Policies Regarding the Safeguarding of Confidential Information: the Chinese Wall and Other Information Barriers" ("Investment Bank Confidential Information Policy"), which explicitly stated: "[w]e regularly receive confidential information as part of our normal client relationships. To breach a confidence or to use confidential information improperly or carelessly would be unthinkable."

18. The Investment Bank Confidential Information Policy prohibited firm employees from trading on the basis of material nonpublic information obtained in the course of their work:

> Confidential information is information that is not publicly available…
>
> The firm takes any misuse, misappropriation, or improper dissemination of confidential information seriously. Misuse and misappropriation of confidential information can violate contractual obligations, laws, rules, or regulations in various jurisdictions in which the firm does business and give rise to both civil liabilities and criminal penalties for the firm and for individual employees…
>
> An employee who is aware of material nonpublic information about an issuer or its securities is prohibited from:
>
> - buying or selling the issuer's securities in personal (including certain related persons'), client, or firm accounts.
> - directing, soliciting, inducing, encouraging, or recommending the purchase or sale of those securities.

19. All personnel of the Investment Bank were also subject to an internal compliance policy entitled, "Personal Trading" ("Personal Trading Policy"), which generally prohibited employees from holding outside brokerage accounts. And even in those limited circumstances where an outside account was permitted, the Investment Bank personnel had to disclose the outside account and also pre-clear all trades with the Investment Bank. The Personal Trading Policy further stated that trading by employees must "comply with all relevant regulations, including, but not limited to, those regarding insider trading and manipulative practices[.]"

20. All of the Investment Bank's employees were provided with training on the Investment Bank Confidential Information Policy and Personal Trading Policy.

## B. Kendricks and Sonoiki Hatch the Insider Trading Scheme

21. In late 2013, Kendricks met Sonoiki at a party. After that first meeting, Sonoiki and Kendricks stayed in contact and exchanged investment and business ideas over the phone. During the summer of 2014, Sonoiki began providing material nonpublic information about Investment Bank-advised deals to Kendricks. In return, Sonoiki received cash and other kickbacks from Kendricks.

## C. Sonoiki Tips Kendricks Information in Advance of Four Deal Announcements

### 1. Insider Trading in Compuware

22. In 2013, Compuware retained the Investment Bank to explore a variety of strategic alternatives for the company. By May 2014, the Investment Bank was actively involved in discussions with the private-equity firm Thoma Bravo about a potential transaction.

23. In or around early July 2014, Sonoiki learned that the Investment Bank's TMT group was advising Compuware on a proposed transaction in which Thoma Bravo would take the company private.

24. On July 14, 2014, Sonoiki texted Kendricks to tell him he had information they could trade on:

| | |
|---|---|
| July 14 3:01 pm | Sonoiki to Kendricks: hit my line soon as you can…Got something for us |
| July 14 5:17 pm | Kendricks to Sonoiki: Yo i might head out there tonight |
| July 14 5:22 pm | Sonoiki to Kendricks: cool even better if we talk in person. got u |

25. Within hours of receiving Sonoiki's texts, Kendricks traveled to New York City, and met Sonoiki during the early hours of July 15, 2014, outside the Investment Bank's downtown Manhattan headquarters.

26. On July 18, 2014, Kendricks paid $850 for a luxury car service to drive Sonoiki approximately 180 miles from New York City to York, Pennsylvania so that Sonoiki could attend a nightclub event hosted by Kendricks. After the event, Sonoiki and Kendricks went to Kendricks' apartment in Philadelphia.

27. Early the next morning, July 19, 2014, while Sonoiki was still at Kendricks' apartment, a brokerage account (the "Kendricks Account") was opened in Kendricks' name at an online brokerage firm (the "Brokerage Firm"). Half an hour later, a note was created in Kendricks' phone containing Compuware's ticker symbol "CPWR."

28. The following week, Kendricks funded the Kendricks Account with $80,000 from a managed account that he held at another brokerage firm. In an apparent attempt to avoid questions from his financial advisor who managed the account, Kendricks moved the money from his managed account to a checking account and only then to the Kendricks Account.

29. When the money arrived in the Kendricks Account, Kendricks and Sonoiki used coded language in text messages to discuss it:

| | |
|---|---|
| July 26 7:39 a.m. | Kendricks to Sonoiki: Yo so the 80 is there |
| July 26 7:00 p.m. | Sonoiki to Kendricks: nah you should keep number 95 [the number on Kendricks' football jersey] |
| July 26 7:42 p.m. | Kendricks to Sonoiki: They said I couldn't get the 80 anyways only WR could get that number |

30. During the last few days of July 2014, the Investment Bank's work on the transaction to take Compuware private intensified. On July 29, the TMT team working on the deal provided a timeline to Thoma Bravo that contemplated a mid-August public announcement of the deal. That evening, Kendricks met Sonoiki outside the Investment Bank's lower Manhattan office, and the two spent the evening on the set of a Teyana Taylor

music video in which Kendricks made a cameo appearance.

31. The next day, July 30, 2014, from his apartment in New York City's financial district, Sonoiki purchased 1,000 Compuware call options with September expiration dates at a cost of approximately $22,000 in the Kendricks Account.

32. A call option contract gives the owner the right to buy a specified amount of an underlying stock at a specified price (the "strike price"), before a specified date (the "expiration date"). The expiration date for all stock options expiring in a given month generally occurs on the third Friday of that month. A call option becomes more valuable as the price of the underlying stock increases relative to the strike price. A person who buys a call option typically believes that the value of the underlying stock will go up, and a person who buys a call option with a short-term expiration typically believes that the value of the underlying stock will go up in the short term.

33. On August 1 and August 5, 2014, following numerous phone calls to Kendricks, Sonoiki, who was in New York City, purchased 1,400 Compuware call options with September expiration dates at a cost of approximately $30,000 in the Kendricks Account.

34. On August 5, 2014, the Brokerage Firm notified Kendricks by e-mail that it had observed trading in the Kendricks Account from an internet protocol ("IP") address in New York City, suggesting that an unauthorized third-party might have access to his account.

35. On August 15, 2014, in New York City, Sonoiki purchased 150 Compuware call options with November expiration dates at a cost of approximately $8,000 in the Kendricks Account.

36. By late August, the impending transaction still had not been announced. Kendricks and Sonoiki exchanged a series of text messages in which Kendricks expressed concern about the trading and Sonoiki attempted to assuage Kendricks' fears:

| | |
|---|---|
| August 23 11:09 p.m. | Kendricks to Sonoiki: I'm getting scared Bruh |
| August 23 11:16 p.m. | Sonoiki to Kendricks: bro, don't get scared |

| | |
|---|---|
| August 27 10:44 a.m. | Sonoiki to Kendricks: ear hustling hard, let's link up or hop on the phone |
| August 27 2:14 p.m. | Kendricks to Sonoiki: I'm getting kind if-y Bruh…Bruh idk |
| August 27 2:18 p.m. | Sonoiki to Kendricks: I hear u. it's still happening, just taking longer than it was supposed to |
| August 27 6:38 p.m. | Kendricks to Sonoiki: I'm losing Bruh |
| August 27 6:38 p.m. | Sonoiki to Kendricks: chill, not losing |
| August 28 12:28 a.m. | Kendricks to Sonoiki: I'm at a messed up place as far as my money is concerned I have enough money to live and to support myself but not enough money to avoid taxes …I don't have enough money to buy a business and get the tax breaks I need |
| August 31 6:34 p.m. | Sonoiki to Kendricks: Haha…I should have some good news for you really soon. |
| August 31 6:41 p.m. | Sonoiki to Kendricks: …don't worry. really soon…that's all I can say… |
| August 31 6:41 p.m. | Kendricks to Sonoiki: …got my hopes all up |

37. Late on the evening of Monday, September 1, 2014 (Labor Day), the *Wall Street Journal* published an article reporting that Compuware was in advanced talks with a private-equity buyer about a going-private transaction and that a deal announcement was imminent.

38. Early the following morning, Tuesday, September 2, 2014 at 7:22 a.m., Sonoiki sent a text message to a colleague at the Investment Bank who was working on the Compuware deal, which the bank had code-named Copper: "congrats on copper btw, just saw it hit the journal. What's the price?" His colleague responded: "Thank you! $10.92 ~25% premium."

39. Later on September 2, 2014, after the market opened, Compuware's stock price rose sharply and closed at $10.59 per share, an approximately 13% increase over the closing price on the prior trading day, Friday, August 29, 2014.

40. That same day, Sonoiki sold all of the Compuware call options he had purchased in the Kendricks Account. In total, Sonoiki purchased Compuware call options in the

Kendricks Account at a cost of approximately $60,000 and sold them for approximately $138,000, netting Kendricks a profit of approximately $78,000.

41. The Defendants' illegal trading in Compuware options generated returns of more than 130% in a little over one month. On September 3, 2014, Kendricks expressed his satisfaction through a text message to Sonoiki telling him: "[y]ou the man."

42. Shortly after generating these illicit profits in the Kendricks Account, Sonoiki began seeking compensation from Kendricks. On September 4, 2014, Sonoiki sent a text message to Kendricks asking Kendricks to "hook [him] up" with Eagles tickets. Sonoiki received the tickets the next day.

43. Also on September 4, 2014, Sonoiki sent a series of text messages to Kendricks in which he used coded language to reference the kickbacks Kendricks had agreed to pay him: "idk when next imma be able to see you...so try to have the bread if you can...the bread in nyc just isn't the same and I really like my cheesesteaks with the stuff you all have in Philly."

44. As alleged in further detail below, in late September and October 2014, Kendricks paid Sonoiki cash kickbacks totaling approximately $10,000 in exchange for his inside information.

**2. Insider Trading in Move**

45. By the first week of September 2014, the Investment Bank's TMT group was advising News Corp in its acquisition of the real-estate information company Move. The Investment Bank team was involved in late-stage negotiations, and expected a deal to be announced imminently. By this point, both News Corp and Move had hired lawyers and investment bankers, drafts of the merger agreement had been exchanged, conditions to a potential tender offer were being discussed between the parties, and the boards of News Corp

and Move had met to evaluate the terms of the offer.

46. By September 4, 2014, a friend of Sonoiki's at the Investment Bank, who was working on the Move deal, had learned that the transaction would be announced on September 8. On September 4, Sonoiki sent a text message to Kendricks: "call me asap."

47. The Defendants took steps to minimize written communications: on September 5, Kendricks sent a text message to Sonoiki with a reminder: "don't write." Sonoiki responded "can you Facetime on your laptop I know." They also exchanged approximately 19 phone calls on September 4 and 5.

48. On Friday, September 5, 2014, Kendricks called the Brokerage Firm in response to the earlier inquiries the firm had made about third-party access to the Kendricks Account. Because Kendricks had not responded timely to the Brokerage Firm's inquiries, the firm had placed a block on the account. Desperate to get the hold lifted, Kendricks told a Brokerage Firm representative on a recorded call: "I am trying get [the block] lifted before the market closes…I really need to do that."

49. After Kendricks told the Brokerage Firm that he would be the only person with access to the Kendricks Account, the firm lifted the hold. The next trading day, Monday, September 8, 2014, the Kendricks Account purchased 224 Move call options with September and October expiration dates at a cost of approximately $20,000.

50. From this point forward, Kendricks, who was in the midst of the NFL football season, enlisted a friend (the "Middleman") to place trades in the Kendricks Account using Kendricks' computer. Kendricks authorized and encouraged the Middleman to act on his behalf and trade for him based on tips from Sonoiki. On September 15, 2014, Kendricks texted the Middleman: "[d]elegation has been passed on to you," and, on September 21: "stop being

so scared of [Sonoiki]…yeah it's all good…Just talk to him."

51. After Kendricks had enlisted the Middleman to assist him, Kendricks still remained involved in the scheme. Sonoiki sometimes called Kendricks directly, and the Middleman updated Kendricks when he had received new information from Sonoiki and when he was planning to trade on it.

52. On or around September 15, 2014, the Investment Bank team working on the Move transaction learned that the deal would be announced soon. On September 15, Sonoiki, Kendricks, and the Middleman exchanged calls, and the Kendricks Account purchased 67 Move call options with October expiration dates at a cost of approximately $9,000. The next day, September 16, the Kendricks Account sold Move call options that were about to expire, and then purchased an additional 50 Move call options with October expiration dates at a cost of approximately $5,000. On September 17, the Kendricks Account purchased 32 additional Move call options with October expiration dates at a cost of approximately $3,000.

53. On September 19, 2014, Sonoiki sent Kendricks a text message asking whether Kendricks could "hook [him] up with tix for [S]unday," whether he could see Kendricks on Sunday, and whether he could collect an "envelope" from Kendricks. That Sunday, Sonoiki and a friend attended the Eagles game against the Washington Redskins using tickets Kendricks provided to Sonoiki. After the game, Kendricks paid Sonoiki approximately $6,000 in cash.

54. On September 23, 2014, the Investment Bank team working on the Move transaction learned that the new target date for an announcement of the deal was the following Monday, September 30. Later that day, the Kendricks Account purchased 330 Move call options with October and November 2014 expiration dates at a cost of approximately $33,000.

55. On September 30, 2014, before the market opened, News Corp and Move announced that News Corp would acquire all outstanding Move shares in a tender offer priced at $21 per share. Following the September 30 announcement, Move's stock price rose sharply and closed at $20.96, an increase of approximately 37% over the stock's closing price of $15.29 on September 29.

56. On October 2 and 3, 2014, the Move call options in the Kendricks Account were sold. In total, the Kendricks Account purchased Move call options at a cost of approximately $71,000, and sold them for approximately $350,000, netting Kendricks a profit of approximately $279,000.

57. The Defendants' illegal trading in Move call options generated returns of more than 392% in less than one month.

**3. Insider Trading in Sapient**

58. By early October 2014, Sonoiki learned that the Investment Bank's TMT group was advising Sapient regarding a potential tender offer by Publicis to acquire the company. By this time, both Sapient and Publicis had engaged investment bankers and lawyers, Publicis had made a proposal to purchase Sapient in a tender offer, and senior managers of the two companies had met to discuss the offer, including the offer price.

59. During the first week of October 2014, Sonoiki and the Middleman exchanged more than 40 phone calls. Following the phone calls, on October 6 and 7, the Kendricks Account purchased 1,523 Sapient call options with October 2014 and January 2015 expiration dates at a cost of approximately $93,000.

60. On October 7, 2014, Sonoiki sent a text message to Kendricks, asking for four tickets to that Sunday's Eagles game. Sonoiki received the tickets from Kendricks, and, on

Sunday, October 12, used the tickets to attend the Eagles game against the New York Giants.

61. On October 9, 2014, the Kendricks Account purchased 36 Sapient call options with October 2014 and January 2015 expiration dates at a cost of approximately $12,000. On October 14, 2014, the Kendricks Account sold Sapient call options that were about to expire and purchased another 185 Sapient call options with November 2014 expiration dates at a cost of $41,000.

62. In or around mid- to late October 2014, Sonoiki took a train to Philadelphia to pick up an additional cash kickback from Kendricks. Sonoiki met Kendricks and the Middleman at Philadelphia's 30th Street Station and received approximately $4,000 in cash.

63. On November 3, 2014, Sapient announced that Publicis had agreed to acquire the company through a tender offer priced at $25 per share, a significant premium to the company's then-current stock price. That day, Sapient's stock price rose sharply and closed at $24.60, an increase of approximately 42% over the stock's closing price of $17.32 on October 31.

64. On November 6, the Sapient call options in the Kendricks Account were sold. In total, the Kendricks Account purchased Sapient call options at a cost of approximately $146,000 and sold them for approximately $635,000, netting Kendricks a profit of approximately $489,000.

65. The Defendants' illegal trading in Sapient call options generated returns of more than 335% in approximately one month.

**4. Insider Trading in Oplink**

66. By late October 2014, Sonoiki learned that the Investment Bank's TMT Group was advising Koch concerning a tender offer to acquire Oplink. By this time, Koch and Oplink had retained investment bankers and lawyers and had exchanged numerous term sheets, as well as a draft merger agreement, setting forth how Oplink would be acquired through a tender offer. Senior managers of the two companies had met numerous times, including to conduct due diligence and to negotiate the price and terms of the transaction. Oplink was now entertaining several offers from other companies and was pushing Koch to work quickly toward a mid-November deal announcement.

67. On October 31, 2014, following several calls from Sonoiki to Kendricks and the Middleman, the Kendricks Account purchased 27 Oplink call options with an expiration date of January 2015 at a cost of approximately $9,000. On November 13 and 17, 2014, the Kendricks Account purchased 2,498 additional Oplink call options with expiration dates of December 2014 and January 2015 at a cost of approximately $438,000.

68. On November 19, 2014, after market close, Oplink announced that Koch would be acquiring the company in a tender offer. The next day, November 20, Oplink's stock price rose sharply and closed at $24.18, an increase of approximately 14% over the stock's closing price of $21.25 on November 19.

69. On November 21 and 24, 2014, the Oplink call options in the Kendricks Account were sold. In total, the Kendricks Account purchased Oplink call options at a cost of approximately $446,000 and sold them for approximately $798,000, netting Kendricks a profit of approximately $352,000.

70. The Defendants' illegal trading in Oplink call options generated returns of more than 78% in less than one month.

## THE SCHEME ENDS

71. In May 2015, Sonoiki's employment with the Investment Bank was terminated, and he lost access to confidential nonpublic deal information.

72. In total, Kendricks received profits totaling approximately $1.2 million from the scheme, and paid Sonoiki approximately $10,000 in cash for his tips, among other benefits, including Eagles tickets and access to the perks of Kendricks' celebrity.

## CLAIMS FOR RELIEF

## FIRST CLAIM

### Fraud in Connection With the Purchase or Sale of Securities Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder (Against Both Defendants)

73. The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 72, inclusive, as if they were fully set forth herein.

74. At the time that Sonoiki placed trades in the Kendricks Account and tipped Kendricks and the Middleman as alleged above, Sonoiki was in possession of material nonpublic information about potential corporate transactions that he obtained because of his employment with the Investment Bank.

75. The Investment Bank treated information about these transactions as confidential, including through policies and procedures designed to protect such information and to prohibit its employees from trading on such information. Specifically, Sonoiki was prohibited, by the Investment Bank's internal compliance procedures, from trading on the basis of material nonpublic information and trading in undisclosed, outside accounts.

76. Sonoiki knew or was reckless in not knowing that the information he used to trade in the Kendricks Account or used to tip Kendricks and the Middleman was material and nonpublic, and that he owed the Investment Bank, its clients, and/or its clients' shareholders a fiduciary duty, or obligations arising from a similar relationship of trust or confidence, to keep the information confidential, and to refrain from trading on it or tipping others to trade.

77. Sonoiki breached a fiduciary duty, or a similar duty of trust and confidence to the Investment Bank, its clients, and/or its clients' shareholders, by trading in the Kendricks Account and tipping Kendricks and the Middleman to trade on the basis of material nonpublic information he obtained through his employment with the Investment Bank.

78. Sonoiki tipped Kendricks and the Middleman for benefits including cash payments, football tickets, a luxury car service ride, and invitations to a nightclub event and the set of a music video.

79. Kendricks knew or recklessly disregarded the information that Sonoiki tipped to him and to the Middleman for trading in the Kendricks Account was material and nonpublic.

80. Kendricks knew, should have known, recklessly disregarded or consciously avoided knowing that that the information that Sonoiki used to place trades in the Kendricks Account or tipped to Kendricks and the Middleman for trading in the Kendricks Account was disclosed or misappropriated in breach of a fiduciary duty or obligation arising from a similar relationship of trust or confidence.

81. By engaging in the conduct described above, Defendants, knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

(a) employed devices, schemes, or artifices to defraud;

(b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or

(c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

82. By engaging in the foregoing conduct, Defendants violated and, unless enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM

### Fraud in Connection With a Tender Offer
### Violations of Section 14(e) of the Exchange Act and Rule 14e-3 Thereunder
### (Against Both Defendants)

83. The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 72 inclusive, as if they were fully set forth herein.

84. The corporate transactions involving Move, Sapient, and Oplink were each structured as tender offers.

85. By September 8, 2014, the date of the first illegal trade by the Kendricks Account in Move securities alleged herein, substantial steps to complete News Corp's tender offer to acquire Move had already been taken. Among other things, News Corp and Move had exchanged drafts of merger agreements detailing the terms of a tender offer and the companies' respective boards had met to review the potential transaction.

86. By October 6, 2014, the date of the first illegal trade by the Kendricks Account in Sapient securities alleged herein, substantial steps to complete Publicis' tender offer to acquire

Sapient had already been taken. Among other things, Publicis had made a proposal to purchase Sapient in a tender offer, and senior managers of the two companies had met to discuss the offer.

87. By October 31, 2014, the date of the first illegal trade by the Kendricks Account in Oplink securities alleged herein, substantial steps to complete Koch's tender offer to acquire Oplink had already been taken. Among other things, senior managers at Koch and Oplink had met numerous times to discuss a potential tender offer, including to conduct due diligence and to negotiate the price and terms of the transaction.

88. Sonoiki obtained material nonpublic information about the contemplated tender offer transactions from his employer, the Investment Bank.

89. Sonoiki knew or had reason to know that this information was nonpublic, and that he had acquired it, directly or indirectly, from the offering person, the issuer of the securities sought or to be sought by such tender offer, and/or any officer, director, partner, employee, or other person acting on behalf of either the offering person or the issuer.

90. Sonoiki, directly or indirectly, placed, directed or caused others to trade in the securities of Move, Sapient and Oplink in the Kendricks Account after substantial steps had been taken to commence tender offers for the shares of these companies and before the tender offers had been publicly announced.

91. Kendricks knew or had reason to know that the information Sonoiki tipped him regarding the Move, Sapient, and Oplink tender offers was nonpublic information that had been acquired from someone working on behalf of the offeror or issuer.

92. At the time that the Kendricks Account traded in Move, Sapient, and Oplink securities as described herein, Kendricks was in possession of material nonpublic information

regarding the Move, Sapient, and Oplink tender offers that he knew or had reason to know was nonpublic and acquired directly or indirectly from someone working on behalf of the offeror or issuer.

93. By reason of the foregoing, defendants violated, unless enjoined, will continue to violate, Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

**I.**

Permanently restraining and enjoining Sonoiki and Kendricks from, directly or indirectly, violating Sections 10(b) and 14(e) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78n(e)] and Rules 10b-5 and 14e-3 thereunder [17 C.F.R. §§ 240.10b-5 and 240.14-e3];

**II.**

Ordering each Defendant to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint, together with prejudgment interest thereon;

**III.**

Ordering each Defendant to pay civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1];

**IV.**

Granting such other and further relief as this Court may determine to be just and necessary.

Dated: 8/29/18

Respectfully submitted,

Jennifer Chun Barry (PA Bar No. 72961)
Kelly L. Gibson (PA Bar No. 91753)
Joseph G. Sansone
Rachael Clarke

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
1617 JFK Blvd., Suite 520
Philadelphia, PA 19103
Telephone: (215) 597-3100